IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 11, 2006 Session

## STATE OF TENNESSEE v. COREY BIGGS

Direct Appeal from the Circuit Court for Lake County
No. 04-CR-8576     R. Lee Moore, Jr., Judge

No. W2005-01569-CCA-R3-CD  - Filed July 21, 2006

Following a jury trial, the defendant, Corey Biggs, was convicted of sale of less than .5 grams of
cocaine, a Class C felony, and was sentenced as a multiple offender to eight years in the Department
of Correction. On appeal, he argues that the evidence is insufficient to support his conviction and
that the trial court erred by not suppressing his out-of-court identification by a police officer.
Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined.
J.C. MCLIN, J., filed a dissenting opinion.

Timothy Boxx, Dyersburg, Tennessee, for the appellant, Corey Biggs.

Paul G. Summers, Attorney General and Reporter; Brian Clay Johnson, Assistant Attorney General;
C. Phillip Bivens, District Attorney General; and Karen Burns, Assistant District Attorney General,
for the appellee, State of Tennessee.

### OPINION

### FACTS

Agent Robert Harrison of the West Tennessee Violent Crime and Drug Task Force testified
that he was the agent in charge for the Twenty-Ninth Judicial District, which included Dyer and Lake
Counties. He said he participated in a "street level drug operation" on January 26, 2004, with Officer
Todd Thayer of the Dyersburg Police Department and a confidential informant, Tony Franks.
Officer Thayer, who had received special training through the task force, was given $100 to make
the drug purchase and his automobile was equipped with audio and video recording equipment.
Although Agent Harrison was in a separate vehicle, he could hear the conversations in Officer
Thayer's vehicle via the monitoring equipment. Franks subsequently made contact with a third man
in Ridgely who instructed Franks and Officer Thayer to drive to Roberts Bayou Road where they

were told to drive to a "T" intersection down the road and get out of the vehicle. They subsequently returned to the vehicle and drove to their pre-arranged meeting location where Officer Thayer gave Agent Harrison what appeared to be six rocks of crack cocaine. The substance was later sent to the Tennessee Bureau of Investigation for testing.

Agent Harrison acknowledged that he did not see the defendant but said the defendant was identified by Franks, the confidential informant. Harrison later obtained a driver's license photograph of the defendant which he showed to Officer Thayer about two months after the drug buy. In Harrison's opinion, police officers have a better memory and capacity for recall than ordinary citizens because it is their "duty to remember who [they] buy[] narcotics from."

Officer Todd Thayer testified that he had been an officer with the Dyersburg Police Department for over eleven years, had worked in narcotics since 2000, and was currently the sergeant over the narcotic unit and bike unit. He said he had attended "several schools, meth schools, several other drug related training on street level drugs." He was assigned to the drug task force in October 2003 and said that on January 26, 2004, he met with Agent Harrison, other agents, and the confidential informant in Lake County. Officer Thayer's vehicle was equipped with an electronic audio transmitter which enabled the agents in the other vehicle to hear what was said in his vehicle. After being supplied with $100 of "buy money," Officer Thayer and the informant drove to Ridgely where they were approached by a man the informant knew. Officer Thayer said the man came up to the passenger's side of his vehicle, there was nothing obstructing his view of the man, and the man's race was black. Franks and Officer Thayer asked the man about purchasing $100 worth of crack cocaine and were told to drive to Roberts Bayou Road where they waited on the side of the road for several minutes before the man drove by and motioned for them to follow him. Officer Thayer said he had a clear view of the man who drove by and that he was the same man who had approached them in town. They then followed the man to a "T" intersection where the man motioned for them to get out of their vehicle and walk over to him. The man instructed them to raise their shirts, and they complied. The man then handed Officer Thayer several rocks of crack cocaine, and Thayer gave him the $100. Officer Thayer said he was standing "[m]aybe a couple of feet" from the man during the transaction and estimated his "face time" with the man as "maybe five minutes." According to Thayer's report, the transaction took place at 12:25 p.m. in "broad daylight." Officer Thayer and the informant then returned to their vehicle and drove back to the meeting place where Thayer turned the drugs over to Agent Harrison.

Officer Thayer said that, at the time of the transaction, he only knew the man who sold him the cocaine "through the CI." Approximately two months later, he identified the defendant from a photograph as "the subject that sold me the crack cocaine at the 'T' intersection in January." He said the defendant's name was not on the photograph, and his appearance on the day of the drug buy was substantially the same as his appearance in the photograph. Officer Thayer said he remembered the defendant "due to the circumstances of following way out in the county."

On cross-examination, Officer Thayer said that he had worked as an undercover officer in Lake County five or six times and that arrests had been made on each occasion. He said he did not

know the defendant prior to the drug buy but did know the confidential informant and had worked with him on previous occasions. He acknowledged that he could not identify the defendant in court (fourteen months after the drug buy) and that he was relying on his previous identification of the defendant's photograph which he viewed two months after the drug buy.

Special Agent Forensic Scientist Dana Rose of the Tennessee Bureau of Investigation Crime Laboratory testified that she analyzed the substance and determined it to be .4 grams of cocaine.

Officer Thayer, recalled by the defense, testified that the confidential informant had said, on the day of the drug buy, "[T]here's Corey Biggs, we're gonna get his ass." Thayer explained that he and the informant had been driving for some time and had not seen anyone the informant knew until he saw the defendant who was on foot. After the video/audio tape of the drug transaction was played, Officer Thayer acknowledged that it reflected that he first saw the defendant for about ten seconds and then for an additional "minute thirty-five, a minute forty" out in the country.

The twenty-eight-year-old defendant testified that he and his cousin, Jerrial Tharps, were at his girlfriend's house when they saw Franks and another man drive by in a gray car. The defendant said one of the men asked him if he had "something for a hundred," and he knew what the man was talking about. The defendant said he shook his head "no" but did not respond out loud because he had heard that Franks was working with the police. The defendant said he and Franks had "bad blood" between them. Tharps then pointed "that way" and told the men where to meet him. The defendant told Tharps that Franks was working for the police, but Tharps said he did not know him and then left in the defendant's car. The defendant said he "guess[ed]" Tharps sold the men "some stuff." Asked why Franks would try to buy drugs from him or Tharps, the defendant replied, "Probably because I was in the gang round about that time." The defendant acknowledged that he had been involved in previous drug transactions but said he stopped selling drugs in February and had moved to Union City. The defendant identified his driver's license photograph and acknowledged that he had a prior conviction for aggravated robbery. He recalled being questioned by Agent Harrison and acknowledged that he did not tell Harrison that it was Tharps who had sold the drugs that day.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to support his conviction for sale of less than .5 grams of cocaine, saying that the State presented insufficient evidence and the trial court erred in not granting his motion for acquittal.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307,

319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To obtain a conviction for sale of less than .5 grams of a Schedule II controlled substance, cocaine, the State was required to show beyond a reasonable doubt that the defendant knowingly sold less than .5 grams of cocaine. Tenn. Code Ann. § 39-17-417(a)(3), (c)(2)(A) (Supp. 2005). Officer Thayer testified as to his buying cocaine from a man he later identified as the defendant. Agent Harrison monitored the transaction through audio equipment, although he did not see the person from whom Thayer bought the cocaine. Special Agent Rose testified that the cocaine sample weighed .4 grams. By the verdict, the jurors obviously believed the testimony of the State's witnesses and disbelieved that of the defendant, as was their right. Accordingly, we conclude that the evidence is sufficient to sustain the conviction.

## II. Out-of-Court Identification of Defendant

The defendant argues that the pretrial identification of him by Officer Thayer was "unduly suggestive" and "akin to a 'show-up'" and that the trial court should have suppressed the identification. The State responds that the defendant has waived the issue for failure to file a motion in limine seeking to suppress the identification pursuant to Tennessee Rule of Criminal Procedure 12(b)(3) and (f). In his reply brief, the defendant argues that this court should not conclude that the issue is waived because the State did not raise this argument in the trial court and, in fact, that court considered the defendant's motion on the merits. We will review these claims.

As previously set out, Officer Thayer, viewing a driver's license photograph of the defendant about two months after the transaction, the photograph not bearing the defendant's name, identified him as the seller of the cocaine. The basis for the defendant's complaint in this regard is that Officer Thayer was shown only a single photograph, thus fatally tainting the identification.

In Neil v. Biggers, 409 U.S. 188, 199, 93 S. Ct. 375, 382, 34 L. Ed. 2d 401 (1972), the United States Supreme Court established a two-part test to determine when a defendant's due process rights have been violated by a pretrial identification. Our supreme court has adopted the same standard to be applied by our courts for assessing whether a pretrial identification has violated the due process rights of the defendant, thereby tainting any in-court identification made by the witness. See Bennett v. State, 530 S.W.2d 511, 512-15 (Tenn. 1975). Under this test, the court first considers whether the identification procedure itself was unduly or unnecessarily suggestive. Biggers, 409 U.S. at 199, 93 S. Ct. at 382. If the identification procedure is found to have been suggestive, the court next considers "whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." Id. (interior quotations omitted). The factors to be considered in evaluating the reliability of an identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. Id. If, however, the court first determines that the identification procedure itself was neither unnecessarily or impermissibly suggestive nor likely to create a substantial likelihood of irreparable misidentification, there is no need to apply the totality of the circumstances test outlined in Biggers. See State v. Leon J. Robins and Tabatha R. White, No. M2001-01862-CCA-R3-CD, 2003 WL 1386835, at *9 (Tenn. Crim. App. Mar. 20, 2003) (citing State v. Butler, 795 S.W.2d 680, 686 (Tenn. Crim. App. 1990)), perm. to appeal denied (Tenn. Oct. 13, 2003).

In State v. Robinson, 146 S.W.3d 469, 516 (Tenn. 2004), cert. denied, __ U.S. __, 126 S. Ct. 1429 (2006), our supreme court set out the numerous authorities as to the standard of review to be applied in an appellate review of the trial court's ruling on a motion to suppress:

> The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001). Absent a showing by the defendant that the evidence preponderates against the judgment of the trial court, this court must defer to the ruling of the trial court. State v. Cribbs, 967 S.W.2d 773, 795 (Tenn.), cert. denied, 525 U.S. 932, 119 S. Ct. 343, 142 L. Ed. 2d 283 (1998).

In considering this issue, we first will review in detail the testimony of Officer Thayer. He testified that he had been a police officer for "[a] little over eleven years," all of which he had spent with the Dyersburg Police Department. At the time of the trial, he was "the sergeant over the narcotic unit and bike unit." As for specialized narcotics training, he said that he had "been to several schools, meth schools, several other drug related training on street level drugs." He said that

he had been assigned to the district violent crime and drug task force in October 2003, and its procedure was for him and the confidential informant to ride together in the vehicle and for Thayer to make the drug purchase. Thayer first viewed the defendant when he approached Thayer's vehicle, on the passenger's side where the informant was sitting, as the defendant instructed where they were to meet him. Thayer then saw and recognized the defendant after he and the informant had gone to this second location, the defendant motioning for them to follow him. Thayer viewed the defendant a third time, after they had followed him, and described how the drug sale occurred after he and the informant exited their vehicle and approached the defendant, as he instructed they do:

A. He made us get up out of the car and we raised our shirts up and turned around so there was no wires present.

Q. All right, now. I hate to give away secrets, but if there wasn't a wire present, where was the audio transmitter?

A. It was on my person.

Q. Okay, but not where you could see it when you pulled your shirt up.

A. No, no.

Q. What happened then?

A. At that time he had the crack cocaine in his hand, he handed me several rocks of crack cocaine, straight from him to my hand and I then gave him the one hundred dollars.

Q. Okay. When you say he handed it to you and you handed it to him, how far apart were your faces?

A. Maybe a couple of feet, maybe.

Q. And, again did you know that individual?

A. No, I did not.

Q. Did you have any problem seeing what that individual looked like?

A. No.

Q. What happened after you received the drugs?

A. I gave him the hundred dollars. Myself and the CI got back in our vehicle and returned to the meeting place.

Officer Thayer testified as to his subsequent identification of the defendant:

Q. Officer Thayer, [the drug sale] was in January, January 26 I believe; is that correct?

A. Yes.

Q. At that time did you know the individual that you had dealt with name [sic]?

A. Only through the CI.

Q. Did you have any problem remembering what he looked like?

A. No.

Q. Approximately two months later – may I approach Your Honor?

   THE COURT: You may.

Q. Were you shown this photograph?

A. Yes, I was.

Q. And what did you do when you were shown that photograph?

A. I ID'd the subject in the photograph as being the one that sold me the crack cocaine on January and I –

Q. Was that subject's name anywhere on that photograph?

A. No, it wasn't.

Q. If that had not been the subject you bought it from would you have had any problem saying it was not that subject?

A. No.

Q. Okay. Did you still remember what that individual looked like?

A. Yes, I did.

Q. Had you received training along that line to be able to identify individuals like that?

A. This particular one I just remembered due to the circumstances of following way out in the county, that's the circumstances on this case.

Asked on cross-examination the total time he had been in the presence of the defendant on the day of the drug buy, Thayer responded, "I'm gonna guess maybe five minutes."[1]

On redirect examination, Thayer said that, when he viewed the photograph of the defendant, "there was no question" that the defendant was the person who had sold the drugs to him. He said that, upon being shown the photograph of the defendant, he "identified him as being the subject that sold me the crack cocaine at the 'T' intersection in January."

Since the trial court determined this matter on the merits, we will attempt to do so as well. However, our ability in this regard is hampered by the path selected by the defendant for the issue. The defendant's oral motion to quash the identification was first raised and then argued after the jury had been sworn. The defendant did not request a hearing out of the presence of the jury on his motion, which was based solely upon the fact that Officer Thayer made his identification from a single photograph. The motion was denied by the trial court. After Officer Thayer's direct testimony had been completed, the defendant renewed his motion, again asserting that the identification should be suppressed. The trial court again denied the motion. Although referring generally to the holding in <u>Biggers</u>, neither at trial nor on appeal has the defendant utilized the specific <u>Biggers</u> factors in his argument. However, we will attempt to do so.

First, we note that Officer Thayer had three opportunities to view the defendant, all in broad daylight. The first occurred when the defendant came to the passenger's side of Thayer's car and instructed Thayer and the informant to meet him at a different location, and the second occurred at the location directed by the defendant. Thayer's third view of the defendant occurred when they were face-to-face, the defendant checking Thayer for a "wire," and as they then exchanged money for drugs. Thus, Thayer viewed the defendant on three occasions, was close to him on two of these, and was face-to-face on the final occasion. As for Thayer's degree of attention, we note that he was acting as an undercover agent making a purchase of illegal drugs, an activity for which he had been trained and in which he was experienced. There is no basis to conclude that he was other than attentive. At trial, while Thayer described the person selling the drugs as a "male black," this description was in response to the specific question, "What race was he?" The record does not reflect what description, if any, Officer Thayer gave of the defendant following the transaction, for it does not contain copies of any reports or other paperwork completed by Officer Thayer following the cocaine purchase. As to Thayer's level of certainty as to his identification, there was "no question" that the person in the photograph was the one who had sold the cocaine to him. The total

_____

[1]Although the record is not entirely clear on this matter, Officer Thayer may have spent closer to two minutes with the defendant as the sale was occurring.

length of time Thayer had to view the defendant was two to five minutes, with the lower figure appearing to be the most likely.

Thus, the defendant's argument must fail for several reasons. First, he chose to make his motion and argument to the trial court with no proof before the court, apparently believing that he was entitled to suppression as a matter of law because Officer Thayer had viewed only a single photograph and could not identify the defendant at trial. The motion was raised and argued again after Thayer had completed his direct examination. The evidence then in the record was that Thayer had three opportunities to view the defendant, the final and longest one being face-to-face. Thayer said he was certain of his identification when he viewed the defendant's photograph.

Further, the defendant's argument fails to acknowledge that Officer Thayer was a trained and experienced police officer and not a lay witness. The authorities are clear that this distinction must be made. See Manson v. Brathwaite, 432 U.S. 98, 115, 97 S. Ct. 2243, 2253 (1977) (in assessing the degree of attention paid by the witness, the court noted that "Glover was not a casual or passing observer, as is so often the case with eyewitness identification. Trooper Glover was a trained police officer on duty and specialized and dangerous duty when he called at the third floor of 201 Westland in Hartford on May 5, 1970."); United States v. Dring, 930 F.2d 687, 693 (9th Cir. 1991) (identifications of single photograph of defendant two weeks after event by customs agents not tainted because agents "were trained professionals, expert at observing criminals, and each agent had a good opportunity to view the person on the pier during the night in question"); Thomas v. State, 775 A.2d 406, 420 (Md. Ct. App. 2001) (six-week delay between drug sale and officer's viewing of single photograph did not make unreliable his in-court identification of defendant when officer had stood "within arm's length, for three or four minutes under bright lights," officer's "entire attention was focused" on defendant," and officer "was not a lay witness describing a criminal to police; he was a police officer making a mental note of what he had seen during the commission of a crime").

Based upon the proof before the trial court that Officer Thayer, a trained and experienced narcotics officer, viewed the defendant in the daylight on three occasions for a total of at least two minutes, the last and lengthiest of these being face-to-face, and two months later was positive in his identification of the defendant from a photograph, we conclude that the record supports the trial court's determination that the motion to suppress was without merit.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgment of the trial court is affirmed.

_____
ALAN E. GLENN, JUDGE